UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

v.

WILLIAM ELIAS (D-1) and
KIMBERLY DOREN (D-2),

        Defendants.

_____/

Case No. 17-20576

Honorable Nancy G. Edmunds

## OPINION AND ORDER DENYING DEFENDANTS'
## MOTION TO DISMISS THE INDICTMENT [32]

This matter comes before the Court on Defendants William Elias ("Elias") and Kimberly Doren's ("Doren") motion to dismiss the indictment with prejudice, filed by Elias on January 26, 2018. (Dkt. # 32). Doren filed a Notice of Joinder on April 10, 2018.[1] (Dkt. # 40). Defendants argue that pre-indictment delays violated their Sixth Amendment right to a speedy trial and their Fifth Amendment due process rights. According to Defendants, the Government has no legitimate excuse for the delay in indicting Defendants, and the Government's conduct demonstrates that this prosecution has been vindictively instituted. The Court heard oral argument on this motion on May 2, 2018. For the reasons stated below, Defendants' motion is DENIED.

_____

[1]Doren relies on the arguments presented in Elias's motion. Her Notice of Joinder includes a brief statement of facts and an affidavit from Doren. The Government has not filed a response to Doren's Notice of Joinder.

## I.  BACKGROUND

### A.  Charges

On August 29, 2017, the grand jury returned an indictment against Defendants.  (Dkt. # 1).  Elias is charged with:  Conspiracy to Commit Bank Fraud (Count One); Bank Fraud (Count Two); Falsification of Records in a Federal Investigation (Count Three); Conspiracy to Commit Money Laundering (Count Four); Money Laundering (Counts Five through Twelve); and HUD Transactions Fraud (Count Thirteen).  *Id.*  Doren is charged with: Conspiracy to Commit Bank Fraud (Count One); Bank Fraud (Count Two); Falsification of Records in a Federal Investigation (Count Three); Conspiracy to Commit Money Laundering (Count Four); Money Laundering (Counts Seven through Eight); and HUD Transactions Fraud (Count Thirteen).  *Id.*

The allegations against Defendants concern a fraud scheme involving short sales of homes, known as "buy and bail," which Defendants allegedly devised and executed.  A "short sale" is a real estate transaction in which a mortgaged property is sold for less than the amount of the outstanding mortgage loan.  The Government describes the alleged scheme as follows:  Under Elias's leadership, Defendants targeted homeowners whose homes were "under water," meaning that the present market values of the houses were less than the outstanding principal balances of the mortgages.  Elias, a real estate broker, represented in radio advertisements and on his website that he and his company, Elias Realty, could help clients obtain new homes, sell their existing homes, and eliminate their existing debt.  Doren was a processing manager and senior negotiator at Elias Realty. When new clients came to Elias's offices, Elias or one of his employees advised them to purchase a new home prior to completing a short sale transaction, and to conceal from the

new lender that they intended to short sell their existing homes. According to the Government, Elias caused loan officers and clients to make two false material representations on the paperwork to buy the new homes: first, that the existing homes were worth substantially more than their actual market values; and second, that the homeowners intended to keep the existing homes and rent them out. In reality, the existing homes were worth much less, and the homeowners intended to sell them via short sales. Nevertheless, Defendants misrepresented each borrower's existing home as rental property, even as they required clients to sign exclusive listing agreements with Elias Realty to sell the existing homes.

In order to qualify for second homes when they already owned homes, Elias allegedly advised clients to obtain Federal Housing Administration ("FHA") loans, which allowed them to obtain approval for new loans despite having high debt. The purchases of the new homes with the FHA-insured mortgages needed to be completed prior to the short sales because the homeowners' credit would be adversely affected by the short sales, which would inhibit them from being approved for new home loans. After purchasing the new homes, Defendants would assist clients with unloading the original under-water houses in short sales.

According to the Government, Defendants profited from this buy and bail scheme through real estate commissions, kickbacks from the title company that closed the deals, commissions from the mortgage company that underwrote the new mortgages, software fees designed to circumvent the Federal Trade Commission's prohibition on charging for loan modification services, and additional fees to a fictitious law firm that Elias created and

owned.  Defendants also allegedly used other entities and people to funnel illicit profits and hide their role in various transactions.

## B. Procedural History

The Department of Housing and Urban Development Office of Inspector General, the Federal Housing Finance Agency Office of Inspector General, the Federal Home Loan Mortgage Company ("Freddie Mac"), and the Federal Bureau of Investigation ("FBI") began investigating Elias and his affiliated business entities[2] in 2012.  In October 2012, Freddie Mac notified Elias and its loan servicers that it was considering adding Elias and his businesses to Freddie Mac's Exclusionary List.  This list identifies individuals and businesses whom Freddie Mac suspects of engaging in fraud or whose business practices are deemed to present an undue risk to Freddie Mac.  According to Defendants, mortgage servicers began cancelling all pending transactions involving Defendants or Elias Realty at that point.

On February 26, 2013, Magistrate Judge Steven R. Whalen issued a search warrant for two of Elias's business locations for evidence showing violations of the federal mail fraud, wire fraud, and bank fraud statutes.  On February 27, 2013, federal agents executed the search warrant and seized some of Elias's property.

On April 8, 2013, Elias filed a motion to unseal in Case No. 13-mc-50293 in order to inspect the application for the search warrant and the federal agent's affidavit in support of the application.  The Government then attached a redacted copy of the application for the

---

[2]Elias's affiliated business entities include Elias Realty; Elias Real Estate, LLC; Elias Real Estate Holdings, LLC; Elias Financial, LLC; Moody, Keegan, Nelson & Associates, PLLC; Michigan Property Ventures, LLC; and Taxfaster, LLC.

search warrant and affidavit to its response.[3]  Magistrate Judge Laurie J. Michelson held

a hearing and observed that, after filing the application for the search warrant and affidavit

under seal, the Government violated the order it had requested:  "[Y]ou redacted it in a way

that's most beneficial to the Government without, it appears, any discussion with the

Defendant. . . . part of it seems a little bit vindictive, I suppose."  Assistant United States

Attorney ("AUSA") Abed Hammoud maintained that the filing was redacted to protect third

parties from either vindictive action by Elias or from their identity being known, as well as

for judicial economy.  Magistrate Judge Michelson ultimately denied Elias's motion to strike

the redacted search warrant affidavit because Elias himself had already publicly disclosed

the fact of the investigation, the targets of the investigation, the subject matter of the

investigation, and documents involved in the investigation in that case, as well as in  a

separate civil lawsuit that Elias filed against Freddie Mac, Case No. 13-cv-10387.

Through its investigation, the Government learned that proceeds from the alleged buy

and bail scheme were eventually used to purchase six real properties, including Elias's

family home and properties belonging to Elias's new business, Michigan Property Ventures,

LLC .[4]  Pursuant to Mich Comp. Laws § 565.451a, the Government recorded affidavits of

interest in the properties in April 2013, November 2013, and January 2014, indicating that

---

[3]The next day, Freddie Mac filed a notice of the Government's filing in support of its motion to dismiss Elias's complaint against Freddie Mac in Case No. 13-cv-10387.  In that case, Elias alleged that his inclusion in Freddie Mac's Exclusionary List caused his real-estate businesses to collapse.  The complaint was ultimately dismissed for failure to state a claim upon which relief can be granted, and the Sixth Circuit affirmed the dismissal. Notably, the district court did not rely on the Government's filing in dismissing the case.

[4]The six properties are: (1) 36695 Clarita, Livonia, MI; (2) 17225 Lennane, Redford, MI; (3) 9977 Hillcrest, Livonia, MI; (4) 1188 Peavy Road, Howell, MI; (5) 40760 Deer Pines Drive, Canton, MI; and (6) 3937 Orchard Drive, Highland, MI.

it had knowledge of facts that supported their potential forfeiture. Elias became aware of the affidavits after a potential buyer ran a title check.

Elias, as owner of Michigan Property Ventures, LLC, then filed a Quiet Title Action, Case No. 14-cv-10215. Michigan Property Ventures, LLC complained that the affidavits of interest clouded the title to its properties and rendered them unmarketable. It asked the court to declare that the affidavits were unauthorized under Michigan law and to remove them. On June 11, 2014, during a hearing on the Government's Motion to Dismiss, Judge Patrick J. Duggan requested the Government's reasonable assurance that it would file a civil forfeiture complaint within a month, and the Government assured the court that it would withdraw the affidavits of interest if it did not file a civil forfeiture complaint within one month. Elias notes that the Government went far longer than 30 days before it withdrew any affidavit of interest and did not file a civil forfeiture complaint until July 2015.[5] The quiet title action was ultimately dismissed for lack of subject matter jurisdiction because the Government had not waived its sovereign immunity.

From July 2014 to March 2015, the parties had a number of discussions regarding the criminal investigation against Defendants and the potential forfeiture action, which included the exchanging of discovery. However, these discussions eventually broke down. On March 9, 2015, movants Elias, Vicky Elias, Michigan Property Ventures, LLC, and Michigan Real Estate Ventures, LLC's filed a motion for return of property under Federal Rule of Criminal Procedure 41(g) in Case No. 13-mc-50293. Shortly thereafter, the Government

---

[5]According to the Government, the reason it did not withdraw the affidavits of interest was because of an agreement it had reached with the movants' counsel. This agreement was communicated to Judge Duggan on July 10, 2014, and remained in place even after the movants later changed counsel. *See* Case No. 13-mc-50293, Dkt. # 36, Pg ID 758-61.

withdrew its affidavits of interest and filed a motion to dismiss the 41(g) motion. The Government also filed a motion for a restraining order in case No. 15-mc-50512. This Court held a hearing on June 10, 2015, and Elias notes that the Court voiced the following at the outset:

> [B]efore I let you get into your argument, and I guess this is for the government, I don't really understand what the government's doing here. You've had this case for two years, and I don't want this to be a case where no good deed goes unpunished and you've been trying to work it out and couldn't work it out so now you're back here, maybe that's the only answer, but it seems to me if you were going to do something, either charge these guys criminally or forfeit the property, you've had plenty of time do it. So what's up?

The Government responded that it was well within the statutes of limitations for these crimes, and that this was a large investigation with multiple witnesses and a large amount of documents seized from Elias's business. The Government also referred to the scarcity of government resources.

On June 15, 2015, this Court denied the motion for return of property, granted the Government's motion to dismiss the 41(g) motion, and granted the Government's motion for a restraining order. The Court found that there was a substantial probability that Elias engaged in an illegal scheme to defraud financial institutions, that proceeds were generated from the scheme, and that those proceeds—along with funds commingled and laundered with those proceeds—were used to purchase the six real properties at issue in the case. The Court granted the restraining order for a period of 45 days, not the full 90 days requested by the Government, reasoning that 45 days was sufficient given the substantial amount of time and resources that had already been invested in the case. In its opinion, the Court also noted that, while it understood the movants' frustrations with the large lapse of time involved in this matter and the unsuccessful negotiations to resolve it, the statutes

of limitations had not yet run on the criminal statutes alleged to have been violated, and the Government was within its rights to pursue the indictment on that time line. *See* Case No. 13-mc-50293, Dkt. # 42, Pg ID 983 n.2.

On July 30, 2015, the Government filed a civil forfeiture complaint in Case No. 15-cv-12679,[6] which ultimately resulted in a consent judgment and final order of forfeiture entered on November 3, 2015.[7] Elias notes that, in this case, the Government filed a motion to strike the claimants' answer because they had not filed verified claims with the Court and therefore had no statutory standing to contest the forfeiture action. Claimants' counsel filed a verified claim of interest the next day, which was six days past the due date. The Government moved to strike the claim of interest as untimely. Claimant's counsel then filed a motion for enlargement of time to file the claim of interest, claiming that it was not timely filed due to an oversight by the assistant to claimants' counsel. Claimant's counsel also filed an affidavit in which his assistant swore that claimants' counsel had given him the

---

[6]In her affidavit, Doren states that she received notice of this action as resident agent of Chase Investment Group, LLC. According to Doren, it was at this time that she realized that she was a target of the investigation. Case No. 17-cr-20576, Dkt. # 40, Pg ID 348. In the civil forfeiture complaint, Michigan Property Ventures, LLC was alleged to have transferred one of the properties to Chase Investment Group, LLC for $1 via Quit Claim Deed, and Chase Investment Group, LLC was alleged to have transferred the property back to Michigan Property Ventures, LLC for $1 via Quit Claim Deed.

[7]Elias notes that the Stipulated Consent Judgment specifies that the real properties located at 40760 Deer Pines Drive, Canton, MI; 17225 Lennane, Redford, MI; and 9977 Hillcreset, Livonia, MI "shall NOT BE FORFEITED in this action or in any action (criminal or civil) for which forfeiture is based upon the conduct alleged in the Complaint for Forfeiture filed by the United States on July 30, 2015." Case No. 15-cv-12679, Dkt. # 30, Pg ID 851-52. According to Elias, the conduct alleged in the indictment in Case No. 17-cr-20576 is substantively identical to the conduct alleged in the previous complaint of forfeiture, yet the Government has given notice of its intention to seek forfeiture of *all* property traceable to the violations set forth in the indictment. *See* Case No. 17-cr-20576, Dkt. # 1, Pg ID 38-39.

claim of interest to attach to the Answer, but that he had inadvertently failed to file the claim. The Government maintained that the assistant's signature on the affidavit was not authentic and issued a subpoena seeking testimony and documents related to the preparation of the verified claim of interest. The claimants moved to quash the subpoena. This Court granted this request, finding that the information sought by additional testimony or documents was not sufficiently relevant to justify the burden of complying with the subpoenas. The Court further noted:

> If the government is correct [that the assistant's signature on the affidavit is not authentic], there may be appropriate sanctions levied against Putative Claimants for submitting falsified documents to the Court. This does not, however, change the underlying facts here: the Government seeks forfeiture of six properties in which (as the Government is well aware) Putative Claimants have an interest. But for being six days tardy, the verified claim of interest appears to comply with Supplemental Rule G(5). Any further explanation of the six-day delay is neither sufficiently relevant, nor necessary.

Case No. 15-cv-12679, Dkt. # 25, Pg ID 815.

 In Elias's affidavit in support of the instant motion to dismiss the indictment, Elias claims that Kassem Dakhlallah, his attorney at the time, urged him to enter into a consent judgment in the forfeiture proceeding and a plea agreement in the criminal proceeding because Mr. Dakhlallah was eager to have Elias be agreeable to the Government after the Government accused Mr. Dakhlallah of forging the affidavit from his assistant. Elias asserts that Mr. Dakhlallah was not forthcoming with him about the various motions and responses filed in the civil forfeiture proceeding. Elias believes that Mr. Dakhlallah did file a fraudulent affidavit to cover himself and then pressured Elias to enter into the consent judgment and plea agreement. *See* Case No. 17-cr-20576, Dkt. # 32-2, Pg ID 166-67.

The criminal bank fraud investigation continued in parallel to the civil forfeiture case and involved multiple potential targets, dozens of witnesses, over thirty boxes of files seized from Elias's offices, thousands of pages of records obtained by grand jury subpoenas, and fourteen hard drives containing several terabytes of electronic files. AUSA Hammoud, Mr. Dakhlallah, and Michael Rex (Doren's attorney) attempted to reach a pre-indictment resolution of the criminal case through several plea negotiations. The negotiations intensified in 2015, around the time Elias and the Government reached a resolution of the civil case. At this time, the criminal case was scheduled to be presented to the grand jury on November 3, 2015. However, as a result of the negotiations between the parties, the grand jury appearance was cancelled. Elias signed a negotiated plea agreement on November 19, 2015, and Doren signed a negotiated plea agreement on December 4, 2015. An information was filed on December 9, 2015 in Case No. 15-cr-20785.

On January 22, 2016, Mr. Dakhlallah notified AUSA Hammoud that he no longer represented Elias, and that Elias did not want to proceed with the plea agreement. In her affidavit, Doren states that she also decided that she did not want to proceed with the plea agreement. Later in January, attorney Mark Krieger notified the AUSA that Elias was in the process of retaining him, and that he would contact the AUSA again when the representation was finalized. Krieger confirmed the representation on May 4, 2016. At the time, AUSA Hammoud was the only assigned criminal AUSA on the case, and he was preparing for a year-long overseas detail with the State Department. The AUSA notified Defendants' attorneys of that development, and the information was dismissed without prejudice on June 23, 2016 because the parties were still unable to resolve the case by way of a plea agreement.

AUSA Hammoud returned from the overseas detail in June 2017 and contacted Mr. Krieger, who stated that it was not a certainty that he would continue to represent Defendant. AUSA Hammoud was then deployed overseas again during the months of July and August 2017. On August 29, 2017, the grand jury returned the indictment against Defendants in the current case.

## II. ANALYSIS

### A. Whether Pre-Indictment Delays Violated Defendants' Sixth Amendment Right to a Speedy Trial

Defendants argues that the Court should dismiss all counts against them with prejudice for a violation of their right to a speedy trial under the Sixth amendment because the Government unnecessarily delayed obtaining the indictment. Defendants note that it has been far longer than a year since the Government formally accused Defendants in the information filed on December 9, 2015, and longer than a year since Defendants invoked their right to a public trial by withdrawing their Rule 11 plea agreements. Defendants further argue that the time between the dismissal of the information and the filing of the indictment should be included in considering the length of the delay because the Government did not act in good faith when it moved to dismiss the information. Defendants assert that there was no valid reason for the Government to wait over fourteen months to obtain an indictment after dismissing the information. Defendants also argue that the Government's conduct prior to its formal accusation of Defendants is inexcusable and relevant to this Court's analysis. According to Elias, he was publicly arrested, for purposes of the Speedy Trial Clause, as early as February 27, 2013.

The Government responds that the Sixth Amendment does not apply to periods between the good faith dismissal of charges and the institution of new charges. The Government argues that, because Defendants' motion rests entirely on conduct that occurred before the indictment was issued against them, their Sixth Amendment claim fails as a matter of law. The Government notes that Defendants offer no support for their contention that the Government acted in bad faith in moving to dismiss the information.

In his reply, Elias concedes that the Government references case law which justifies denying Defendant's motion, and that a similar delay between dismissing an information and obtaining an indictment does not warrant dismissal in most cases. *See* Case No. 17-cr-20576, Dkt. # 35, Pg ID 323. However, Elias argues that the Government's conduct in this case and its failure to pursue this case with any due diligence warrants dismissal.

The Sixth Amendment provides that "the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. This Clause is "an important safeguard to prevent undue and oppressive incarceration prior to trial, to minimize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself." *United States v. Marion*, 404 U.S. 307, 320 (1971) (internal quotation marks and citations omitted). Courts must balance four factors to determine whether a delay violated the Sixth Amendment right to a speedy trial: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant. *Barker v. Wingo*, 407 U.S. 514, 530 (1972). "No one factor is determinative; rather, they are related factors which must be considered together with such other circumstances as may be relevant." *United States v. Robinson*, 455 F.3d 602, 607 (6th Cir. 2006).

The Sixth Amendment right to a speedy trial, however, does not attach until a defendant is arrested or formally accused, even where prosecuting authorities had knowledge of the offense long before this. *Marion*, 404 U.S. at 319-21; *Betterman v. Montana*, 136 S. Ct. 1609, 1613 (2016); *United States v. MacDonald*, 456 U.S. 1, 7 (1982) ("no Sixth Amendment right to a speedy trial arises until charges are pending"). Until a person is arrested or charged, he "suffers no restraints on his liberty and is not the subject of public accusation: his situation does not compare with that of a defendant who has been arrested and held to answer." *Marion*, 404 U.S. at 321. "Reflecting the concern that a presumptively innocent person should not languish under an unresolved *charge*, the Speedy Trial Clause guarantees the *accused* the right to a speedy *trial*." *Betterman*, 136 S. Ct. at 1614 (internal quotation marks and citation omitted).

In *Marion*, the Supreme Court acknowledged that — even pre-arrest, before the right to a speedy trial arises — the passage of time "may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself." 404 U.S. at 321. Nevertheless, the Supreme Court concluded that "this possibility of prejudice at trial is not itself sufficient reason to wrench the Sixth Amendment from its proper context"— that is, its post-arrest or post-charge context. *Id.* at 321-22. Before arrest or indictment, while the State investigates to determine whether to arrest and charge a suspect, and while the suspect remains at liberty, statutes of limitations provide the primary protection against delay and overly stale criminal charges. *Id.* at 322. Additionally, the Due Process Clause of the Fifth Amendment would require dismissal of the indictment if it were shown that pre-indictment delay caused substantial prejudice to a defendant's right to a fair trial and that the delay was an intentional device to gain tactical

advantage over the accused.  *Id.* at 324.  Thus, the statutes of limitations and Due Process Clause protect against prejudice caused by the passage of time.  The Speedy Trial Clause, on the other hand, is designed to minimize the possibility of lengthy incarceration prior to trial, to reduce the impairment of liberty imposed on an accused while released on bail, and to shorten the disruption of life caused by arrest and unresolved criminal charges. *MacDonald*, 456 U.S. at 8.

The Supreme Court has also held that "the Speedy Trial Clause has no application after the Government, acting in good faith, formally drops charges.  Any undue delay after charges are dismissed, like any delay before charges are filed, must be scrutinized under the Due Process Clause, not the Speedy Trial Clause."  *MacDonald*, 456 U.S. at 7.  Once charges are dismissed, "any restraint on liberty, disruption of employment, strain on financial resources, and exposure to public obloquy, stress and anxiety is no greater than it is upon anyone openly subject to a criminal investigation."  *Id.* at 9.  The Supreme Court acknowledged that the knowledge of such an ongoing investigation will cause stress, discomfort, and disruption in normal life, "[b]ut with no charges outstanding, personal liberty is certainly not impaired to the same degree as it is after arrest while charges are pending." *Id.*

In this case, Defendants do not and cannot point to any post-indictment delay.  During the period before the filing of the information, and during the period between the dismissal of the information and the filing of the indictment, Defendants were not under arrest, in custody, or subject to any criminal prosecution.  Elias repeatedly asserts that he was "first accused in February 2013."  However, he offers no support for the proposition that the execution of the search warrant in February 2013 was the equivalent of a public accusation

for Sixth Amendment purposes.[8]  He fails to explain how his position at that point was any different from that of anyone openly subject to a criminal investigation.  That law enforcement might have known about the alleged criminal activity as early as 2012 makes no difference to the Sixth Amendment analysis because Defendants remained at liberty, free to go about their personal and professional affairs.  Likewise, after the dismissal of the information, under *MacDonald*, Defendants were legally and constitutionally in the same posture as though no charges had been made.  Defendants were not languishing under unresolved criminal charges.  The Court therefore concludes that Defendants' Sixth Amendment claim fails.[9]

---

[8] *See United States v. Lovasco*, 431 U.S. 783, 788-89 (1977) (noting that only a formal indictment or information or else the actual restraints imposed by arrest and holding to answer a criminal charge engage the particular protections of the Speedy Trial Clause of the Sixth Amendment).

[9]      The parties discuss *United States v. Haulman*, 288 F. Supp. 775 (E.D. Mich. 1968), at length.  In that case, an investigation into the records of the Warren Bank began in January 1964, and an indictment was filed in May 1966.  *Id.* at 776.  In July 1967, the district court dismissed most of the charges.  The defendant then demanded a speedy trial for the first time, which was scheduled for August 1967.  *Id.* at 777.  Because of the wide spread civil disorder in Detroit at that time, the assigned AUSA could not prepare for the trial, and he gave notice that he was resigning the following month.  The case was reassigned to another AUSA a few days before the scheduled trial, and the Government moved to dismiss the remaining counts.  The district court granted the motion.  *Id.*  The defendants were again indicted with violating federal banking laws in December 1967 and moved to dismiss the indictment based on the length of time they were under investigation and indictment.  *Id.* at 778.  The district court granted the motion.  *Id.* at 778.  Very significant to the court's decision was the fact that six important witnesses died between 1965 and 1968; each was a high-level bank employee with critical knowledge of relevant facts.  *Id.* at 778-79.  The court found that the defendant's suffered substantial prejudice to their right to a fair trial as a result of the delays.  *Id.* at 779.  In light of that finding, the court also took judicial notice of personal hardship to the defendants.  *Id.* at 780.  The court also made clear that it was not sympathetic to the fact that the investigation had taken as long as it had or the fact that it had been reassigned to another AUSA.  *Id.* at 779-80.  However, this Court notes that the *Haulman* investigation took place in the 1960s, before voluminous electronic records of the kind involved in this case existed.

In an attempt to avoid this conclusion, Defendants argue that the Government did not act in good faith when it moved to dismiss the information. In support, Defendants merely assert that the Government had no valid reason for waiting fourteen months after moving to dismiss the information to indict Defendants. However, there is no indication that the Government dismissed and later re-instituted charges to evade the speedy trial guarantee. *See MacDonald*, 456 U.S. at 10 n.12. Rather, Defendants no longer wanted to proceed with their negotiated plea agreements and Elias took time to retain a new attorney shortly before the only assigned criminal AUSA was deployed overseas. The record shows that the AUSA was diligent upon his return. Defendants have not shown that the Government did not act in good faith when it moved to dismiss the information. Accordingly, the Court will analyze Defendants' arguments under the Due Process Clause of the Fifth Amendment.

### B. Whether Pre-Indictment Delays Violated Defendants' Fifth Amendment Due Process Rights

Defendants next argue that the Court should dismiss all counts against them because the Government's delay in obtaining the indictment violated Defendants' due process rights

---

The Court agrees with the Government that this case is significantly different from *Haulman*. In the instant case, the investigation took place over the course of approximately two years, which is a reasonable amount of time for a bank fraud investigation involving several potential targets, many witnesses, and voluminous electronic records. The case was ready for indictment in November 2015, but the grand jury appearance was cancelled because Defendants agreed to plead guilty. An information was filed, but Defendants decided to not proceed with the plea agreements, and Elias decided to hire a different attorney. The information was dismissed, and an indictment was filed promptly after the assigned AUSA returned from an overseas assignment. Significantly, as discussed below, Defendants have failed to show that the pre-indictment delay in this case caused substantial prejudice to their right to a fair trial.

under the Fifth Amendment.  According to Defendants, they suffered substantial prejudice to their right to a fair trial.  Defendants also argue that the pre-indictment delay was an intentional device by the Government to harass Defendants and gain a tactical advantage.

The Government responds that the Due Process Clause is implicated only if the defendant suffers actual prejudice and the Government acts with the requisite bad faith. The Government argues that Defendants cannot show substantial prejudice to their right to a fair trial, or that the Government intentionally delayed the indictment to gain a tactical advantage.

The Due Process Clause of the Fifth Amendment has a limited role, beyond the safeguards provided by statutes of limitations, in protecting a defendant's rights against oppressive delay in the commencement of a criminal prosecution when the delay is unjustified by the legitimate needs of the investigation or prosecution.  *See United States v. Greene*, 737 F.2d 572, 574 (6th Cir. 1984).  A dismissal of an indictment because of pre-indictment delay is warranted only when the delay (1) causes "substantial prejudice" to the defendant, and (2) is "an intentional device to gain tactical advantage over the accused." *Id.*; *Marion*, 404 U.S. at 324.  Importantly, "the Due Process Clause does not permit courts to abort criminal prosecutions simply because they disagree with a prosecutor's judgment as to when to seek an indictment."  *United States v. Lovasco*, 431 U.S. 783, 790 (1977). Rather, courts "are to determine only whether the action complained of . . . violates those fundamental conceptions of justice which lie at the base of our civil and political institutions, and which define the community's sense of fair play and decency."  *Id.* (internal quotation marks and citations omitted).

**1.  Substantial Prejudice**

Defendants argue that they suffered substantial prejudice to their right to a fair trial in several ways during the fourteen months between the dismissal of the information and the filing of the indictment.

First, Elias argues that he was prejudiced because former Elias Realty realtor Tara Scott died on January 14, 2014, a year after the execution of the search warrant. According to Elias's affidavit, Scott was involved in management meetings and trainings and would have testified to the representations Elias made to clients during consultations. Scott would have also testified that Elias never represented that fees to Moody, Keegan, Nelson & Associates, PLLC were attorney fees or that the entity was a law firm. According to Elias, Scott would have further testified regarding the legitimacy of the fee collected for use of software. According to the Government, Elias has failed to present any evidence establishing that the Government knew of Scott's impending death, knew of her alleged knowledge of Elias's business practices, and stalled the investigation as a result. The Government argues that there is evidence to undermine Elias's claim that Scott was indispensable to his defense. According to the Government, not one of the nineteen employees of Elias interviewed by the Government mentioned Scott or her alleged role in the company. Additionally, as of the time that the Government copied the contents of Elias's cell phone in February 2013, Scott was not in the top 35 numbers contacted by Elias either by call or text message. The company directory listed Scott as one of 35 agents at the Livonia office. According to the Government, all of her alleged testimony can be presented by other employees and addressed through company e-mails that explained Elias's business processes. Under these circumstances, the Court finds that Elias has not shown that Scott's death during the pre-indictment period substantially prejudiced his right

18

to a fair trial. *See United States v. Rogers*, 118 F.3d 466, 475 (6th Cir. 1997) ("Even where a defendant specifies what a deceased witness's testimony would have been, actual prejudice is difficult to prove."). Elias has not shown that exculpatory evidence has been lost and cannot be obtained through other means. *See id.* Additionally, the Court is not convinced that Scott would have definitely testified, that her testimony would have withstood cross-examination, or that the jury would have found her a credible witness. *See id.* The Court further notes that Scott passed away less than a year after the Government executed the search warrant, which would not have been enough time to conclude a bank fraud investigation of this scale.[10]

Second, Doren claims to have suffered substantial prejudice to her right to a fair trial because the delay has affected her ability to find essential witnesses for her defense. Notably, Doren's detailed affidavit contains no mention of difficulty finding any witness. Doren fails to provide any detail regarding these "essential witnesses." Accordingly, the Court finds that Doren has not shown that delay on the part of the Government interfered with her ability to find any witness so as to substantially prejudice her right to a fair trial.

Third, Elias claims to have suffered further substantial prejudice to his right to a fair trial because some Government witnesses have altered their previous statements to be more incriminating of Elias over time. In particular, Elias points to two witnesses: Elizabeth Matthews and T.S.. Matthews, former loan officer for Gold Star Mortgage, initially asserted that clients voiced their intention to short sell their existing home, and that Matthews, in

---

[10]Again, this investigation involved multiple potential targets, dozens of witnesses, and voluminous records. In his motion, Elias himself notes the voluminous discovery in this case.

assisting them to fill out loan applications, would explain that they could label their current property as sold, pending sale, or rental. Matthews would then ask clients if any label was applicable, and the clients would tell her that they intended to rent their homes. However, in a second interview, Matthews asserted that Elias instructed her to list the homes as rentals. T.S., a homeowner whose real estate transaction has been used as an example of the alleged buy and bail scheme, initially asserted that he drafted his own hardship letter with the help of Elias Realty representatives. However, in a second interview, T.S. asserted that he took no part in drafting his own hardship letter. The Government correctly notes that such inconsistent statements on the part of prosecution witnesses could actually benefit Elias at trial. The Court finds that Elias has not shown that the inconsistent testimony of these witnesses during the pre-indictment period substantially prejudiced his right to a fair trial.

Fourth, Defendants claims that the Government's prolonged allegations of their guilt have caused them anxiety and have caused their memories to fade. The Government argues that loss of memory by a witness is not sufficient to establish prejudice, and that increased anxiety is not relevant in the pre-indictment context. Notably, Elias's detailed affidavit in support of the instant motion contains no mention of memory loss. He does not suggest that he is unable to assist in his own defense. Doren, on the other hand, states in her affidavit that she has "very little memory of the business or what occurred at Elias Realty. I find it increasingly hard to defend myself having little to no memory this far into the investigation." However, her very detailed affidavit would seem to belie this assertion. In any event, "loss of memory is an insufficient reason to establish prejudice." *United States v. Wright*, 343 F.3d 849, 860 (6th Cir. 2003). Furthermore, Defendants cite no case

law supporting the argument that anxiety to a witness or defendant can establish substantial prejudice to the right to a fair trial. The Court finds that Defendants have not shown that anxiety or memory loss during the pre-indictment period substantially prejudiced their right to a fair trial.

Fifth, Defendants claim that the Government's prolonged allegations of their guilt have ruined their marriages. According to the Government, Elias's marriage was not ruined because of this case and had been rocky since at least 2007 when his ex-wife filed for divorce. *See* Case No. 17-cr-20576, Dkt. # 34-2. She filed for divorce a second time in 2016, alleging that Defendant was mentally and emotionally abusive to her and her children and referencing a domestic assault charge from 2015. The Government correctly notes that nowhere in her complaint does she mention the criminal prosecution against him. *See id.* at Dkt. # 34-3. In her affidavit, Doren states that this case has been a major strain on her marriage. However, she also states that several other factors strained her marriage including her heavy alcohol use and depression after Elias Realty was shut down once Elias was placed on Freddie Mac's Exclusionary List, her husband's decision to take out a personal loan to pay for an attorney she decided to retain in 2015, a $60,000 bill from the Internal Revenue Service ("IRS") following an audit, and the couple's decision not to have children. The Court finds that Defendants have not shown that strain on their marriages during the pre-indictment period substantially prejudiced their right to a fair trial.

Sixth, Elias claims that the Government's prolonged allegations of his guilt have destroyed his businesses and finances. According to the Government, Elias's financial woes are not the result of this prosecution. The Government points to a January 31, 2013 court filing in which Elias claimed that it was his placement on Freddie Mac's Exclusionary

List that destroyed his business, causing hundreds of short sale transactions to be canceled or placed on hold and costing him at least $2 million in revenues. *See* Case No. 17-cr-20576, Dkt. # 34-4, Pg ID 283-86, 289-90, 296, 300-01. Elias made the same claims in a February 2015 letter to Freddie Mac, stating as follows.

> The effects of the exclusionary list have been devastating not just professionally but personally. The reality, whether intended or otherwise, is an industry wide boycott by all lenders which results in my inability to practice Real Estate, or to fulfill important decisions such as buying or selling a home. As a result of the addition to your exclusionary list, I was forced to close down all operations at all locations putting 115 employees and independent contractors out of a job. . . . The harm to personal and business reputation as a result is irreparable. I will probably never be able to practice Real Estate again and even if I tried, my reputation is so badly damaged that it is unlikely I will have the success I once enjoyed. As a result of the exclusionary list addition, I am unable to obtain employment of any kind in the Real Estate and Mortgage Industries.

(Dkt. # 34-5, Pg ID 307-08).

The Government did not bar Elias from conducting business or working to earn a living. His real estate license remained valid until October 31, 2015, and according to his ex-wife, Elias continuously refused to obtain employment even though he was physically able to find employment. *See* Dkt. # 34-6; Dkt. # 34-3, Pg ID 266. The Court finds that Elias has not shown that delay on the part of the Government destroyed his businesses and finances so as to substantially prejudice his right to a fair trial.

Similarly, Doren claims that she has been financially ruined as a result of this prosecution. However, according to her own affidavit, it was the fact that Elias Realty was shut down once Elias was placed on Freddie Mac's Exclusionary List that caused her to lose her job and become unmotivated and her professional reputation to suffer. Her financial trouble was exacerbated due to her husband taking out a personal loan to pay for an attorney she decided to retain in 2015, as well as her receiving a $60,000 bill from the

IRS following an audit. The Government did not bar Doren from working to earn a living. Indeed, Doren states in her affidavit that she obtained a position at a local real estate company after the dismissal of the information and later went on to work as an independent realtor. The Court finds that Doren has not shown that delay on the part of the Government destroyed her finances so as to substantially prejudice her right to a fair trial.

To the extent Defendants ask this Court to presume prejudice from the length of the pre-indictment delay, the Court declines to do so. While such a presumption of prejudice might apply in a Sixth Amendment speedy-trial case, the Sixth Circuit has refused to apply the presumption to Fifth Amendment pre-indictment delay claims. *See United States v. Schaffer*, 586 F.3d 414, 425 (6th Cir. 2009); *United States v. Vaughn*, 444 F. App'x 875, 880 (6th Cir. 2011). In this context, Defendants must show that the pre-indictment delay caused them actual prejudice in presenting their defenses. This, they have not done.

Because the pre-indictment delay in this case did not cause substantial prejudice to Defendants' right to a fair trial, the Court concludes that dismissal of the indictment is not warranted and notes that it need not consider the Government's intent.

### 2. Reasons for the Delay

Nevertheless, even if Defendants had shown that they suffered substantial prejudice to their right to a fair trial (which, as discussed above, they did not), dismissal of the indictment would remain unwarranted because Defendants have not shown that the pre-indictment delay was an intentional device by the Government to gain a tactical advantage.

Defendants argue that the pre-indictment delay was an intentional device by the Government to harass Defendants and gain a tactical advantage. According to Elias, this

was especially displayed during the civil forfeiture proceeding during which the Government intended to seize the properties unopposed with full knowledge of Elias's interest. Elias asserts that, after this type of conduct, there is no reason for this Court to believe that the Government was ever or is ever capable of fair play or decency when it comes to Elias.

"[A] defendant's Fifth Amendment due process rights are generally not implicated where the government offers a valid reason for the delay." *United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992). "[I]t is firmly established that the defendant must show that the government purposely delayed in order to gain a tactical advantage over the defendant." *Rogers*, 118 F.3d at 476 (internal quotation marks and citations omitted).

The record in this case indicates that the initial delay was the result of investigative efforts; this was a complex bank fraud investigation involving several targets and voluminous documentary and electronic evidence. Subsequent delay was the result of protracted plea negotiations and Elias's change of counsel.[11] Finally, the fourteen-month delay between the dismissal of the information and the filing of the indictment was the result of the deployment of the only assigned criminal AUSA overseas and limited government resources. Because this case involves voluminous discovery and institutional knowledge, the Government determined that the case could not be feasibly passed on to another AUSA in a short period of time, and that it was not necessary to do so with no statute of

---

[11] *See Vermont v. Brillon*, 556 U.S. 81, 90-91 (2009) (noting that delay caused by the defendant or defendant's counsel is charged against the defendant, which accords with the reality that defendants may employ delay as a defense tactic, given that witnesses may become unavailable or their memories may fade over time).

limitations problem pending.[12]  Consistent with this explanation, the Government sought

and filed the indictment less than a month after the assigned AUSA returned from overseas

in August 2017.  As this Court has previously noted, while Defendants' frustrations are

understandable, the Government was within its rights to pursue the indictment on this time

line, which is contemplated by the applicable statutes of limitations.  *See Schaffer*, 586 F.3d

at 425.  The record supports the explanation that the delay came about as an incidental

consequence of this permissible decision on the part of the Government.  There is no

indication that the Government purposely delayed in order to gain a tactical advantage over

Defendants.[13]  Indeed, as the Supreme Court has noted, this kind of delay can hurt the

prosecution more so than the defendants because the prosecution relies on witnesses to

carry its burden of proof.  *See Barker*, 407 U.S. at 521.

Defendants also argue that the Government has violated their due process rights

through their vindictiveness.  In order to establish a claim of vindictive prosecution, a

defendant must show that he exercised a protected right; that the prosecutor had a stake

in the exercise of that right; that the prosecutor's conduct was unreasonable; and that the

prosecution was initiated with the intent to punish the defendant for the exercise of that

protected right.  *See United States v. Anderson*, 923 F.2d 450, 454 (6th Cir. 1991); *Nat'l*

---

[12]Although Defendants mention that if the Government had waited much longer to obtain an indictment, then the statute of limitations period on some of the counts would have expired, Defendants do not argue that the statute of limitations period actually did expire on any of the counts prior to the filing of the indictment.

[13]As in *Schaffer*, Defendants' assertion that there could be no valid reason for the Government's delay in filing the indictment is insufficient.  "The applicable standard . . . neither imputes nor presumes an improper purpose where the defendant simply cannot fathom a valid reason for the delay."  *Schaffer*, 586 F.3d at 426.

*Eng'g & Contracting Co. v. Herman*, 181 F.3d 715, 723 (6th Cir. 1999). If a defendant

makes such a showing, then the district court may find that there is a reasonable likelihood

of vindictiveness and may presume an improper vindictive motive.

Defendants argue that the Government had a stake in Defendants' exercise of their

right to a fair and public trial when they withdrew their Rule 11 plea agreements because

the Government was not ready or willing to prove its burden at that time, and that it was

patently unreasonable for the Government to delay indicting Defendants for over a year.

The Court declines to presume an improper motive in this case because Defendants cannot

show that the prosecutor's conduct was unreasonable or that the prosecution was initiated

with the intent to punish Defendants for exercising a protected right. Defendants' assertion

that the Government was "patently unreasonable" is insufficient to show that Defendants

were singled out for prosecution *because* they withdrew their Rule 11 plea agreements or

exercised their right to a fair and public trial. Rather, it was reasonable for the Government

to seek an indictment after plea negotiations failed within the statues of limitations period

for the criminal statutes alleged to have been violated.[14]

_____

[14]The case that Defendants primarily rely on to argue that the indictment should be
dismissed on grounds of prosecutorial vindictiveness is *United States v. LaDeau*, 734 F.3d
561 (6th Cir. 2013). In that case, the defendant was initially indicted on a single count of
possessing child pornography, which carried a sentencing range of zero to ten years of
imprisonment. The defendant moved to suppress the evidence that he had such materials
in his possession. The district court granted the motion, and the Government then obtained
a superseding indictment charging the defendant with a conspiracy to receive child
pornography, based on evidence that had been in the government's possession since
before the initial indictment. The new charge carried a greater sentencing range of five to
twenty years of imprisonment. The district court dismissed the superseding indictment on
grounds of prosecutorial vindictiveness because it found that the Government was
unreasonable in indicting the defendant for a receipt conspiracy when a possession
conspiracy was available and would have carried an identical statutory sentencing range
as that carried by the charge in the initial indictment. *Id.* at 565. The Sixth Circuit affirmed,

The Court concludes that Defendants have not shown that the pre-indictment delay in this case was an intentional device on the part of the Government to gain a tactical advantage. Defendants' Fifth Amendment claim fails.

## C. Whether to Dismiss the Indictment under Federal Rule of Criminal Procedure 48(b)

Alternatively, Defendants argue that the Court should use its discretion to dismiss the indictment under Federal Rule of Criminal Procedure 48(b) because the Government unnecessarily delayed obtaining the indictment. Defendants rely on the same arguments discussed above. The Government responds that Rule 48(b) does not compel dismissal of the indictment because Defendants cannot show substantial prejudice to their right to a fair trial, or that the Government intentionally delayed the indictment to gain a tactical advantage, relying on the same arguments discussed above. Defendants reply that Rule 48(b) does not require a showing of substantial actual prejudice.

Rule 48(b) provides that a "court may dismiss an indictment, information, or complaint if unnecessary delay occurs in: (1) presenting a charge to a grand jury; (2) filing an information against a defendant; or (3) bringing a defendant to trial." Fed. R. Crim. P. 48(b). The notes of the advisory committee state that "[t]his rule is a restatement of the inherent power of the court to dismiss a case for want of prosecution." Rule 48(b) is a codification of a district court's fundamental supervisory powers over the disposition of criminal cases, permitting it to dismiss a case because of unnecessary or unreasonable

---

finding that the district court did not abuse its discretion. *Id.* at 570. The facts in *LaDeau* are distinguishable from the facts here where the indictment followed a breakdown of plea negotiations instead of a successful motion to suppress that made it impossible for the prosecution to proceed on the initial charges.

delay even where such delay does not rise to the level of a constitutional violation.  *See United States v. McLemore*, 447 F. Supp. 1229, 1237, 1239 (E.D. Mich. 1978).  However, as Defendants concede, Rule 48(b) was designed, in large part, to implement the speedy-trial guarantee of the Sixth Amendment, and the Supreme Court has stated that Rule 48(b) is limited to post-arrest situations.  *Marion*, 404 U.S. at 463; *McLemore*, 447 F. Supp. at 1234-35.

Defendants argue that the Court should apply the balancing test prescribed in *Barker v. Wingo* used to determine whether a delay violates the Sixth Amendment right to a speedy trial.  Again, those factors are:  (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant.  *Barker*, 407 U.S. at 530.  In the Sixth Amendment context, prejudice consisting of anxiety and concern is considered (unlike in the Fifth Amendment context, where the inquiry is limited to prejudice which interferes with the defendant's ability to mount and present a defense).  *United States v. Ciammitti*, 720 F.2d 927, 929 (6th Cir. 1983).

Defendants cite *United States v. Giacalone*, 477 F.2d 1273 (6th Cir. 1973).  However, in that case, the Sixth Circuit reversed the dismissal of the indictment.  Giacalone had first been indicted in November 1968.  He was acquitted of extortion charges after a jury trial in June 1971.  In January 1972, he was again indicted, this time with tax violations and conspiracy to defraud the United States.  The new charges related to and involved funds received by the defendant from one of the alleged extortion transactions upon which the first indictment was based.  *Id.* at 1274.  The district court dismissed the indictment under Rule 48(b) because the Government had offered an inadequate explanation for the delay.  The district court also found that the defendant had been denied due process under the

28

Fifth Amendment.  *Id.*  The Sixth Circuit reversed and found that the district court misapplied Rule 48(b), which is limited to post-arrest situations.  The Sixth Circuit explained that the defendant had not been arrested for the new charges until the filing of the second indictment.  Therefore, Rule 48(b) did not apply to the period of time prior to the filing of the second indictment.  *Id.* at 1274-75.

Defendants also point to *McLemore*, a case in which the district court applied the *Barker v. Wingo* balancing test to the Rule 48(b) analysis.  The Court finds, however, that *McLemore* involved facts which are very different form the facts in the instant case.  For example, in *McLemore*, the defendant was arrested and had been in custody for over a year before the filing of the indictment.  447 F. Supp. at 1236.  In this case, Defendants were not incarcerated or subject to bail requirements before the filing of the information or during the fourteen months between the dismissal of the information and the filing of the indictment.

The Court finds that the facts in *Ciammitti* are much more on point.  In *Ciammitti*, the defendants were arrested in January 1980.  Two months later, a magistrate judge dismissed the complaint and canceled the defendants' bonds.  Over two years later, the defendants were indicted for offenses arising out of the same events.  The defendants moved to dismiss the indictment because of pre-indictment delay, relying exclusively on Rule 48(b).  The district court denied the motion, refusing to apply *Barker* or consider evidence of personal hardships brought about by the delay.  The Sixth Circuit found that the district court did not abuse its discretion.  The Sixth Circuit relied on *MacDonald* and held that prejudice consisting of anxiety, concern, or personal hardships was insufficient to require dismissal of the indictment where no charges had been pending between the

dismissal of the complaint and the filing of the indictment, and where the defendants were unable to establish actual prejudice to their ability to defend or intentional delay to gain some tactical advantage or to harass on the part of the Government. The Sixth Circuit noted that, like the defendant in *MacDonald*, the defendants were in the same position as if no charges had been made once the complaint was dismissed.

The Court concludes that Rule 48(b) does not apply to the period of time before the filing of the information, or to the period of time between the dismissal of the information and the filing of the instant indictment because Rule 48(b) is limited to post-arrest situations. The pre-indictment delay in this case was within the applicable statutes of limitations, which remain "the primary yardstick for measuring pre-accusation delays to prevent possible prejudice." *Giacalone*, 477 F.2d at 1275 (quoting *United States v. DeTienne*, 468 F.2d 151, 156 (7th Cir. 1972)). As in *Ciammitti*, there is no need for the Court to apply *Barker* or consider personal hardship during the period of time before the filing of the information or the period of time between the dismissal of the information and the filing of the indictment because there were no charges pending and because, as discussed above, Defendants have not established actual prejudice to their ability to defend or intentional delay to gain some tactical advantage or to harass on the part of the Government.

Finally, Elias argues that the Government's conduct in this case, prior to Elias's formal accusation, is so extraordinary that this Court should deviate from the case law discussed above and exercise its discretion to dismiss the indictment under Rule 48(b). First, Elias claims that there is no explanation for the Government providing reasonable assurances to Judge Duggan that it would either file a civil forfeiture complaint or remove its affidavits

of interest and then completely failing to do so. However, as discussed above and in this Court's prior opinion, the Government did not withdraw the affidavits of interest because of an agreement it reached with Elias, which was communicated to Judge Duggan. *See* Case No. 13-mc-50293, Dkt. # 36, Pg ID 758-61. Second, Elias claims that there is no excuse for the Government's efforts to deny Elias the opportunity to be heard in the civil forfeiture action. However, it was Elias's counsel who failed to timely file a verified claim of interest in that action. In any event, this Court did afford Elias an opportunity to be heard, and the civil forfeiture action resulted in a consent judgment. Third, Elias claims that there is no excuse for the Government entering into a plea agreement with Elias knowing that Elias relied on advice from a conflicted attorney where the Government was responsible for creating the conflict. Elias cites no case law and relies exclusively on his own affidavit asserting that Mr. Dakhlallah was eager to have Elias be agreeable to the Government after the Government accused Mr. Dakhlallah of forging the affidavit from his assistant. On October 22, 2015, this Court granted the motion to quash the Government's subpoena seeking testimony and documents related to the preparation of the verified claim of interest by Mr. Dakhlallah's assistant. Case No. 15-cv-12679, Dkt. # 25. On November 3, 2015, the civil forfeiture action resulted in a consent judgment. Elias then signed the negotiated plea agreement on November 19, 2015, and an information was filed on December 9, 2015 in Case No. 15-cr-20785. In any event, the plea agreement was never entered, Elias retained a different attorney, and the information was dismissed. While Elias suspects that Mr. Dakhlallah acted improperly, he has not shown that the Government did so. Under these circumstances, the Court declines to exercise its discretion to dismiss the indictment under Rule 48.

### III. CONCLUSION

For the reasons set forth above, the Court DENIES Defendants' Motion to Dismiss

the Indictment (Dkt. # 32).

SO ORDERED.


                              S/Nancy G. Edmunds
                              Nancy G. Edmunds
                              United States District Judge

Dated:  May 7, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record
on May 7, 2018, by electronic and/or ordinary mail.

                              S/Lisa Bartlett
                              Case Manager